<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NICKY N., | Civil Action No. 23-3440 (SDW) |
|           Plaintiff, | **OPINION** |
|    v. | April 9, 2024 |
| COMMISSIONER OF SOCIAL SECURITY, | |
|           Defendant. | |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Nicky N.'s ("Plaintiff")[1] appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner") with respect to Administrative Law Judge Dina R. Loewy's ("ALJ Loewy") denial of Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under the Social Security Act (the "Act").  (D.E. 1.)  This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Venue is proper under 42 U.S.C. § 405(g).  This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

I.     <u>PROCEDURAL AND FACTUAL HISTORY</u>

    A.    **Procedural History**

On January 17, 2021, Plaintiff applied for a period of disability and DIB.  (D.E. 3

---

[1] Plaintiff is identified only by his first name and last initial in this opinion, pursuant to Standing Order 2021-10, issued on October 1, 2021, available at https://www.njd.uscourts.gov/sites/njd/ files/SO21-10.pdf.

Case 2:23-cv-03440-SDW   Document 10   Filed 04/09/24   Page 2 of 16 PageID: 1120

(Administrative Record ("R.")) at 65–66.)  He alleged disability beginning on June 27, 2019, due to diabetes mellitus, frequent urination, cervical disc disease, obesity, obstructive sleep apnea, hearing loss, and arthritis in the hands.  (R. 66, 151.)  The claims were denied initially on July 22, 2021, and upon reconsideration on November 15, 2021.  (R. 80, 85.)  On April 5, 2022, ALJ Loewy held an administrative hearing via telephone, and on June 16, 2022, she issued a written decision finding that Plaintiff was not disabled.  (R. 12–29.)  On April 20, 2023, the Appeals Council denied review (R. 1–6), making the ALJ's decision the Commissioner's final decision.  *See* 20 C.F.R. § 404.900;[2] 42 U.S.C. § 405(g).  Plaintiff then filed the instant appeal in this Court, and the parties timely completed briefing.  (D.E. 1, 6, 7, 9.)  Plaintiff's appeal raises four principal arguments:  (1) the ALJ neglected to consider Plaintiff's urinary frequency and urgency caused by his diabetes; (2) the ALJ failed to adequately consider Plaintiff's cervical radiculopathy, which caused weakness in his hands and precluded him from frequent reaching, handling, and fingering; (3) the ALJ failed to evaluate Plaintiff's overhead reaching limitations when considering the past relevant work that Plaintiff could perform; and (4) the ALJ incorrectly concluded that Plaintiff could return to his past work that required 8-to-12-hour workdays, while Plaintiff is limited to only an eight-hour workday.  (*See generally* D.E. 6.)

## B.    Factual History

Plaintiff is 60 years old and alleges that he became disabled on June 27, 2019 (the "alleged onset date"), at 55 years old.  (R. 151.)  Plaintiff has two years of college education and previously worked as a food salesclerk and as a chef.  (R. 41, 186–190.)  He stopped working on the alleged onset date due to a back injury sustained in November 2018, for which Plaintiff sued his employer

---

[2] This opinion cites only the regulations addressing DIB found at 20 C.F.R § 404.1500 *et seq*., and not the parallel regulations addressing SSI found at 20 C.F.R. § 416.900 *et seq*., because they are "identical" for present purposes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n.3 (3d Cir. 2005).

and received incremental compensation.   (R. 41.)   Plaintiff received all increments of compensation by the time he testified before ALJ Loewy.  (R. 41.)

1.  Physical Impairments

Plaintiff has an extensive history of serious health conditions.  In 2003, he was diagnosed with diabetes mellitus (R. 843); in July 2016, he was diagnosed with benign localized hyperplasia of the prostate ("BPH")[3] with urinary retention (R. 341, 342); and in November 2018, he began suffering from spinal canal stenosis and a cervical disc herniation after he was involved in a workplace incident (R. 328, 340).  As a result of these conditions, Plaintiff has undergone several treatments and endured numerous symptoms and side effects—including frequent urination, Nocturia, neck and back pain, bilateral hand numbness and tingling[4], reduced strength in his upper extremities, and reduced range of motion—that have limited his ability to perform work. Plaintiff's ailments are well documented, but there is mixed evidence of their severity.

i.  *Diabetes and Frequent Urination*

Plaintiff has consistently complained of urinary frequency to his urologist over many years, but the medical records of his urinary frequency are inconsistent.  While Plaintiff reported to some doctors that his frequency improved with prescribed medication, he regularly reported to his urologist that he experienced persistent urinary frequency.   (R. 651, 660.)   Despite those complaints to his urologist, another doctor consistently marked Plaintiff as negative for frequency. (R. 643, 646.)   Furthermore, Plaintiff oftentimes received treatment for *difficulty* urinating as opposed to frequency.  (R. 394, 422, 435.)  The following is a more comprehensive summary of

---

[3] Benign prostatic hyperplasia ("BPH"), also known as an enlarged prostate, can cause several symptoms that affect the kidney, bladder, and urinary tract, including urinary frequency, urgency, and restriction of urine flow.  (D.E. 6 at 7 n.4.)

[4] Plaintiff claims that he suffers from radiculopathy (R. 43), or pain that originates in one's spine due to a pinched nerve root but travels to the arms and hands.  *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy.)

the relevant medical evidence of Plaintiff's frequency.

On November 27, 2018[5], Dr. John Sanzone examined Plaintiff for complaints of frequent urination, Nocturia, and weak urinary stream, *i.e.*, difficulty urinating. (R. 340.)  After conducting those examinations, Dr. Sanzone diagnosed Plaintiff with Nocturia and frequent micturition. (R. 340, 343.)  On December 11, 2018, Plaintiff again visited Dr. Sanzone, during which time Dr. Sanzone remarked that Plaintiff's Nocturia symptoms were "stable and mildly bothersome". (R. 365.)

In January 2019, Plaintiff twice saw Dr. Francis Bauer.  Dr. Bauer indicated that Plaintiff was negative for frequency, urgency, and difficulty urinating. (R. 643, 646.)  Notwithstanding Dr. Bauer's assessments, Plaintiff returned to Dr. Sanzone on March 7, 2019, complaining of frequency, Nocturia, and weak urinary stream.  (R. 377–378.)  Dr. Sanzone again described Plaintiff's Nocturia symptoms as "stable and mildly bothersome." (R. 377.)

Thereafter, Plaintiff underwent two genitourinary surgical procedures[6] to treat his BPH. The first procedure was laser prostrate surgery.  Before undergoing that procedure, Plaintiff sought medical clearance from Dr. Bauer on March 25, 2019. (R. 394.)  At that time, Dr. Bauer recorded Plaintiff as positive for decreased urine volume, difficulty urinating, and urgency, but negative for frequency. (R. 394.)

After Plaintiff underwent the laser prostate surgery, his complaints of frequency persisted: on May 23, 2019, Plaintiff saw Dr. Sanzone and complained of frequency (R. 422); in June 2019,

---

[5] Notably, Plaintiff complained of his frequency years before November 2018.  (R. 15, 159.)

[6] Plaintiff first underwent laser prostrate surgery on April 25, 2019 and subsequently underwent a transurethral bladder neck insertion on November 25, 2019.  (R. 406, 458.)  Dr. Sanzone was the operating surgeon for both procedures. (*Id.*)

Plaintiff had an A1C[7] of 8.6, lower than the 9.3 A1C Plaintiff had reached prior to the alleged onset period but still indicative of urinary frequency (R. 827–828); and on November 14, 2019, Plaintiff saw Dr. Sanzone and again complained of Nocturia (R. 435).  Despite Plaintiff's complaints, Dr. Sanzone again described the Nocturia symptoms as "stable and mildly bothersome" at the visits in both May 2019 and November 2019.  Moreover, at the November 2019 visit, Dr. Sanzone noted Plaintiff's weak urinary stream and "worsening symptoms associated with the prior surgery." (R. 422, 435.)  Dr. Sanzone further observed that Plaintiff's "[s]ymptoms [we]re similar to pre Laser with frequency, weak stream, straining to urinate." (R. 435.)  As a result, Dr. Sanzone ordered a transurethral resection of a bladder neck contracture. (R. 422, 435.)

On November 25, 2019, Plaintiff underwent that procedure. (R. 450.)  Weeks later, Dr. Sanzone examined Plaintiff, who reported that he felt well but still complained of frequency. (R. 459.)  Nevertheless, in January of 2020, Dr. Bauer again marked Plaintiff as negative for frequency and urgency, and Plaintiff's A1C reading of 7.0 reflected improvement. (R. 636.)  Dr. Bauer made similar findings during Plaintiff's visit in May of 2020. (R. 633.)

Plaintiff visited Dr. Sanzone again in August 2020 and September 2020.  Dr. Sanzone continued to describe Plaintiff's Nocturia symptoms as "stable and mildly bothersome," and again noted Plaintiff's "worsening symptoms associated with the prior surgery." (R. 468, 491.)  During the September 2020 visit, Dr. Sanzone prescribed 25 milligrams of Myrbetriq for Plaintiff's urgency and frequency. (R. 494.)

The next month, Dr. Sanzone documented an escalation in Plaintiff's complaints of

---

[7] A1C or hemoglobin A1C, is a measure of blood sugar levels.  An A1C at or below 5.7% is normal, whereas 5.7% to 6.4% is pre-diabetic, and anything greater than 6.4% is diabetic.  *See* Centers for Disease Control, *All About Your A1C* https://www.cdc.gov/diabetes/managing/managing-blood-sugar/a1c.html (last updated Nov. 30, 2022).

frequency and increased the dosage of the prescribed medication, which showed at least some beneficial effect.  (R. 675.)    In October 2020, Dr. Sanzone noted that Plaintiff's "biggest" complaint was frequency and urgency but also noted that the Nocturia was "minimal."  (R. 679–680.)  Accordingly, Dr. Sanzone increased the dosage of Myrbetriq by 50 milligrams.  (R. 682.)  By November 2020, Plaintiff's A1C had improved, falling to 7.6.  (R. 610, 813.)

In December 2020, Plaintiff reported to Dr. Sanzone and complained of frequency and minimal Nocturia.  (R. 675.)  Plaintiff also indicated that the Myrbetriq was "some help" but that he had stopped taking the medication because his insurance did not cover it.  (*Id.*)  In turn, Dr. Sanzone prescribed Plaintiff Ditropan—as a substitute for Myrbetriq—which proved to be somewhat effective.  (R. 651, 660, 679.)

Throughout 2021, multiple doctors noted Plaintiff's improvement.  In March, June, and September 2021, Plaintiff visited Dr. Sanzone, who noted that Plaintiff's frequency and urgency improved with Ditropan and that Plaintiff's Nocturia was minimal.  (R. 651, 660, 669.)  In April 2021, Plaintiff also reported to Dr. Alexander Hoffman that his diabetes was under "relatively decent control" using a "combination of pills and insulin."[8]  (R. 617.)  Dr. Ramona Glasser observed Plaintiff's A1C levels—which appeared stable at 7.1 in May, June, and September 2021—and attributed those improved A1C readings to Plaintiff's medication.  (R. 813, 855.)  Furthermore, in September 2021, Dr. Francis Bauer again marked Plaintiff as negative regarding symptoms of urgency and frequency.  (R. 627.)  Finally, in May and October 2021, non-examining physicians of the New Jersey Department of Disability Determinations reviewed the medical record and considered Plaintiff's claims of frequent urination, yet they did not find additional workday bathroom breaks necessary.  (R. 68–69, 75–76.)

---

[8] At this visit, Dr. Hoffman made no record of Plaintiff complaining about frequency or urgency.  (R. 617.)

*ii. Cervical Disc Disease*

Plaintiff has also been suffering from back injuries sustained after a workplace incident in or around November 2018.  (R. 328, 340.)  Shortly after the workplace incident, Plaintiff saw Dr. Robert Bazzini on November 20, 2018, complaining of bilateral hand numbness and tingling, which interrupted his sleep and worsened with driving and speaking over the phone.  (R. 298.) During that visit, Plaintiff did not mention neck or radicular pain.  (R. 298.)  After physical inspection, Dr. Bazzini determined Plaintiff possessed full range of motion in the cervical spine, neck, shoulders, elbows, wrists, and fingers. (R. 299.)  Dr. Bazzini diagnosed Plaintiff with carpal tunnel and recommended Plaintiff splint his hands at night as well as limit activities that require gripping with his hands.  (R. 299.)

Approximately one week later, a CT scan showed that Plaintiff suffered from moderate spinal canal stenosis throughout the cervical spine.[9]  (R. 301.)  A January 2019 MRI further revealed moderate-to-severe canal stenosis and disc herniation causing mild compression of the spinal cord.  (R. 860–865.)  Dr. Faloon ordered cervical fusion surgery to address stenosis of the cervical spine, cervical spondylosis[10], and cervical herniated nucleus pulposus with myelopathy[11]. (R. 316–318, 328.)  At pre-surgery inspection, Plaintiff retained 4/5 strength in all muscle groups and could walk without assistance despite an unstable gait, but he reported decreased sensation in both hands.  (R. 898, 899, 901.)  Following the July 8, 2019 surgery, Plaintiff used a cane but could

---

[9] Spinal stenosis is a condition where compression of the spine and nerves causes pain and weakness.  *See* Jonathan Grauer, *Spinal Stenosis*,  https://www.yalemedicine.org/conditions/spinal-stenosis (last visited Apr. 8, 2024).

[10] Cervical spondylosis is a condition where age-induced bone spurs develop on the spine.  *See* Mayo Clinic Staff, *Cervical Spondylosis*, https://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/symptoms-causes/syc-20370787 (Nov. 18, 2023).

[11] Cervical herniated nucleus pulposus with myelopathy is a prolapse of an intervertebral disk through a tear in the surrounding annulus fibrosus.  *See* Samir Sharrak, *Cervical Disc Herniation*, https://www.ncbi.nlm.nih.gov/books/NBK546618/ (last updated Aug. 28, 2023).

manage gross movement in his extremities and his neck was in good alignment.  (R. 889.)

In the months thereafter, Plaintiff's conditions showed signs of improvement.  In August 2019, Plaintiff was able to grossly move his extremities although he was using a rigid cervical collar.  (R. 886.)  After several months of physical therapy, Plaintiff's upper extremity strength improved to 4/5 without focal deficits.  (R. 878, 881, 994, 875, 916–1024.)  In October 2019, Plaintiff reported improvement and the ability to do more things overhead without issue.[12]  (R. 1019.)  In January 2020, Plaintiff reported 2/10 pain at physical therapy and was discharged after meeting 75% of his goals, which included overhead motion without pain.  (R. 917–18, 1022–24.)  Although Plaintiff's physical therapist noted mild pain and difficulty grasping and gripping, Plaintiff expected to return to work in February of 2020.  (R. 916–17.)

In July 2020, though, Dr. Faloon diagnosed Plaintiff with radiculopathy affecting the upper extremities and noted that Plaintiff had plateaued in function.  (R. 868.)  Dr. Faloon noted Plaintiff's complaints of numbness, tingling in his hands, and tolerable axial neck pain relieved via activity modification.[13]  (R. 868.)

In April 2021, Dr. Hoffman examined Plaintiff at the behest of the Social Security Administration.  (R. 617.)  Dr. Hoffman determined Plaintiff was able to make a fist in both hands and could grip with 4/5 strength in his right hand despite radicular pain, difficulty in extending fingers, and occasional spastic episodes.  (R. 617–18.)  Dr. Hoffman also observed some reduced range of motion in the cervical spine.  (R. 618.)

In May 2021, Dr. Encarnacion, one of the state non-examining physicians, reviewed

---

[12] In October 2019, Plaintiff also complained of discomfort in moving the neck, but he reported more capability in his arms.  (R. 1016.)

[13] Plaintiff again visited Dr. Faloon in February of 2022 complaining of limited range of motion and pain.  (R. 866.) Dr. Faloon diagnosed Plaintiff with slight exacerbation of his chronic condition consistent with his injury and treatment.  (R. 867.)

Plaintiff's file and acknowledged Plaintiff's complaint of spinal pain radiating to both hands but still considered Plaintiff capable of occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, pushing and pulling without limitation, and standing six hours out of an eight-hour workday.  (R. 69.)

    2.   <u>Hearing Testimony and ALJ Loewy's Decision</u>

On April 5, 2022, Plaintiff testified at a hearing before ALJ Loewy and reiterated his limitations.  He stated that his strength was limited to lifting five pounds; that he could sit, stand, and walk for less than an hour at a time; that the range of motion in his neck hindered his peripheral vision when driving; that his constant neck pain radiated down to his hands and prevented him from typing entirely or writing for more than five minutes at a time; and that his diabetes requires him to use the bathroom every 20 to 30 minutes.  (R. 42, 44–47.)  Plaintiff further testified that he takes ibuprofen for his pain instead of opioids and stated that he drives locally for grocery shopping, washes clothes, and prepares food for his children.  (R. 42, 48.)

Following Plaintiff's testimony, vocational expert Dale Pasculli ("VE") appeared at the hearing.  (R. 50.)  The VE explained, among other things, that a person with Plaintiff's characteristics and limitations could perform the past relevant work as generally performed.  (R. 51–55.)  When asked if his testimony was consistent with the DOT and SCO, the VE responded in the affirmative and noted that the DOT and SCO do not specify the frequency of reaching in each direction.  (*Id.*)  Accordingly, the VE relied on his professional experience in determining that the relevant jobs required only occasional overhead reach, which Plaintiff was able to do.  (R. 55.)  Neither Plaintiff's counsel nor the ALJ challenged the VE on this characterization; indeed, ALJ Loewy determined that the VE's testimony was consistent with the DOT and elected to rely on the VE's professional experience in light of DOT's purported silence regarding the frequency

of overhead reaching.  (R. 28–29.)

Thereafter, ALJ Loewy found that, based on the record, Plaintiff's symptoms secondary to

diabetes mellitus did not rise to the level of severity required to find disability pursuant to Listings

for other body functions.  (R. 20–21.)  ALJ Loewy also specifically addressed Plaintiff's testimony

of his alleged diabetes symptoms, holding that while Plaintiff's determinable impairments could

reasonably cause Plaintiff's symptoms, the record did not support the intensity, persistence, and

limiting effects Plaintiff alleged.   (R. 23.)   Regarding cervical spine disease, ALJ Loewy

determined the record did not support sufficient muscle weakness, significant sensory loss, or a

medical need for a device to assist in ambulation as required to qualify for listings relevant to

degenerative disk disease (Listing 1.15, Disorders of the Skeletal Spine Resulting in Compromise

of a Nerve Root, Listing 1.16, Lumbar Spinal Stenosis Resulting in Compromise of the Cauda

Equina).  (R. 19–20.)  ALJ Loewy also determined that Plaintiff's radiculopathy was not severe.

(R. 19.)

The ALJ further modified Plaintiff's residual functional capacity ("RFC") to account for

his limiting symptoms, such as accounting for his diabetes symptoms and giving Plaintiff the

benefit of the doubt as it pertained to his overhead reaching capacity, clearing him for only

occasional overhead reaching.  (R. 19, 21.)  Even with those additional limitations, ALJ Loewy

did not find that Plaintiff qualified for disability.  Therefore, on June 16, 2022, ALJ Loewy denied

Plaintiff's application for a period of disability and disability insurance benefits.  (R. 12–29.)

## II.    LEGAL STANDARD

This Court's review of an ALJ's factual findings is limited to determining whether there is

substantial evidence to support those conclusions, 42 U.S.C. § 405(g) ("The findings of the

[agency] . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Biestek*

*v. Berryhill*, 139 S. Ct. 1148, 1153 (2019); however, it exercises plenary review of the legal issues decided by the ALJ, *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011).

To make a disability determination, the ALJ follows a five-step, sequential analysis. 20 C.F.R. § 404.1520(a); *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201–03 (3d Cir. 2019). The ALJ determines whether the claimant: first, is currently engaged in substantial gainful activity; second, has a "severe" and "medically determinable" impairment; and third, has an impairment or combination of impairments that is equal to, or exceeds, one of those included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(a)(4)(i), (ii), (iii). Before reaching the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC"), *i.e.*, the "most [the claimant] can still do despite [his or her] limitations" in terms of meeting the "physical, mental, sensory, and other requirements of work." *Id.* §§ 404.1520(a)(iv), 404.1545(a)(1), (e). Then, at step four, the ALJ ascertains whether the claimant can still do his or her past relevant work, by comparing his or her RFC to the "physical and mental demands" of that work. *Id.* §§ 404.1520(a)(iv), (f); *see id.* § 404.1560(b)(1) (defining past relevant work). Finally, at step five, the ALJ decides whether the claimant "can make an adjustment to other work," considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v), (g). "The burden of proof is on the claimant at all steps except step five, where the burden is on the Commissioner." *Hess*, 931 F.3d at 201.

## III.  **DISCUSSION**

Plaintiff's arguments follow in four parts. First, Plaintiff contends that ALJ Loewy improperly evaluated his RFC because she failed to proffer sufficient reasons for rejecting the symptoms of frequent urination. (D.E. 6, 15–16.) Second, Plaintiff insists that ALJ Loewy improperly evaluated Plaintiff's RFC as it pertained to his symptoms deriving from his cervical

disease.  (*Id.* at 18.)  Third, Plaintiff avers that ALJ Loewy improperly relied on the VE regarding the requisite frequency of overhead reaching at Plaintiff's prior occupations in deeming him capable of working those jobs.  (*Id.* at 19–23.)  Fourth, Plaintiff asserts that ALJ Loewy incorrectly determined that he could return to his past work and failed to consider his inability to work ten to twelve hours a day.  This Court addresses each argument in turn and rejects them.

*First*, ALJ Loewy provided a sufficient explanation for rejecting Plaintiff's complaints of frequent urination.  ALJ Loewy acknowledged that Plaintiff "endorsed frequent urination secondary to his diabetes, noting that he must use the bathroom every twenty to thirty minutes," (R. 22); however, ALJ Loewy found Plaintiff's assertions regarding the intensity, persistence, and limiting effect of his frequency were not consistent with the evidence in the record.  (R. 23.)  As ALJ Loewy put it, "they are inconsistent because the claimant is able to successfully manage his diabetes with prescription medication as evidenced by the lowering of his glucose and A1C."  (*Id.*)

Substantial evidence supports ALJ Loewy's determination.  *See Jesurum v. Sec'y of U.S. Dep't of Health and Human* Services, 48 F.3d 114, 117 (3d Cir. 1995) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").  As an initial matter, the medical records demonstrate that:  Dr. Bauer marked Plaintiff as negative for frequency prior to his laser prostate surgery (R. 394); Plaintiff's urologist noted that his frequency was "better" with medication (R. 651); Plaintiff did not complain of frequency to Dr. Hoffman (R. 617, 627); and State examining physicians did not find additional bathroom breaks necessary after reviewing Plaintiff's medical history (R. 68–69, 75–76).  While the record also shows that Plaintiff consistently complained of frequency to Dr. Sanzone, substantial evidence in the record nevertheless supports ALJ Loewy's decision.  To arrive at a different outcome would require this Court to re-weigh of the factual conclusions of the ALJ; such

an endeavor would depart from this Court's mandate on appeal. *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009) ("The presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." (citing *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972)); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (explaining that a federal court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder").

***Second***, ALJ Loewy appropriately accounted for Plaintiff's claims related to his cervical disease, including his radiculopathy, in evaluating Plaintiff's RFC, and relied on substantial evidence in arriving at her decision. To be sure, ALJ Loewy acknowledged Plaintiff underwent cervical spine fusion surgery, and that Plaintiff complained of numbness and tingling in his hands. (R. 24, 25, 875.) Nevertheless, ALJ Loewy noted that: Plaintiff completed physical therapy, where he met 75 percent of his goals; thereafter, Plaintiff planned to return to work as a chef on light duty; Plaintiff regained 4/5 strength in his upper extremities; and by January 2022, Plaintiff reported that his numbness and tingling was intermittent. (R. 19, 27, 875, 878, 881, 916–1024.) ALJ Loewy also noted that Plaintiff was not taking opioid medication, could drive locally, and did not require a cane or other assistance to ambulate. (R. 617, 619.) Furthermore, ALJ Loewy credited the reports of state examining physicians, Drs. Encarnacion and Sobelman, and out of an abundance of caution, ALJ Loewy assessed that Plaintiff required several additional limitations, deeming Plaintiff capable of only occasional overhead reaching and frequent general reaching, handling, and fingering. (R. 19.) In sum, the record—including Plaintiff's successful physical therapy regimen, his retention of strength in his upper extremities, his ability to ambulate without a cane, and his manageable pain level—contains substantial evidence to support ALJ Loewy's

decision.

   ***Third***, ALJ Loewy appropriately relied on the VE's testimony in determining that Plaintiff could perform the duties of his past occupations.  An ALJ is permitted to "use VEs . . . to resolve complex vocational issues."  Social Security Ruling ("SSR") 00-4p ("the Ruling"), 2000 WL 1898704, at *2 (Dec. 4, 2000).  "Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT."  *Id.*  When, however, "there is an apparent unresolved conflict between [VE's] evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the [VE's] evidence to support a determination or decision about whether the claimant is disabled."  *Id.*  "The Ruling . . . puts the burden on the ALJ to uncover the existence of any conflicts between the [VE's] testimony and the DOT . . . ."  *Boone v. Barnhart*, 353 F.3d 203, 208 n.14 (3d Cir. 2003); SSR 00-4p, 2000 WL 1898704, at *1 ("This ruling emphasizes that before relying on [VE] evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts . . . .").

   Circuits are split regarding the extent to which an ALJ must identify and investigate apparent conflicts.  On the one hand, the Second Circuit maintains that "[t]estimony that a claimant with overhead reaching limitations is capable of performing a job that the [DOT and SCO] describe[] as requiring 'reaching,' . . . creates at least an apparent conflict that triggers the Commissioner's duty to elicit an explanation that would justify crediting the testimony."  *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 92 (2d Cir. 2019).  And, according to the Second Circuit, an ALJ cannot "fulfill this obligation through 'catch-all question[s],'" such as by asking the VE "whether th[e] opinion 'was consistent with [the DOT]."  *Id.* at 93–94.  The Third Circuit, on the other hand, does not require such a searching inquiry.  *See Zirnsak v. Colvin*, 777

F.3d 607, 617 (3d Cir. 2014). Instead, Third Circuit precedent dictates that, where neither the VE nor the claimant's attorney identifies an inconsistency at the hearing, the ALJ need go no further than the catch-all question: "Is the testimony that you did provide consistent with the information I'd find in the [DOT] and other relevant vocational sources?" *Id.* If, at the hearing, no conflict is identified by the VE, the ALJ, or claimant's attorney, this Court's review is limited only to whether the alleged conflict was "so obvious that the ALJ should have pursued the question." *Id.* at 619 (quoting *Simpson v. Astrue*, No. 10-2874, 2011 WL 1883124, at *7 (E.D. Pa. May 17, 2011)).

Here, as in *Zirnsak*, Plaintiff failed to raise the apparent conflict at the hearing. Since Plaintiff did not do so, ALJ Loewy fulfilled her duties when she asked the VE whether their testimony was consistent with the DOT, to which the VE responded in the affirmative. (R. 55.) Because any apparent conflict was not "obvious enough that the ALJ should have picked up on [it] without any assistance," ALJ Loewy was not required to inquire any further and, thus, did not commit reversible error. *Zirnsak*, 77 F.3d at 618 (quoting *Terry v. Astrue*, 580 F.3d 471, 478 (3d Cir. 2009)).

*Fourth*, ALJ Loewy correctly determined that Plaintiff could return to his past work as generally performed in the national economy. Plaintiff argues that ALJ Loewy's determination was incorrect because Plaintiff can only work eight-hour days whereas many chef jobs, including his past positions, required 10-to-12-hour workdays. (D.E. 6 22–23.) Plaintiff's argument is unpersuasive. As an initial matter, ALJ Loewy did not find that Plaintiff could return to his past jobs as he used to specifically perform them; rather, she held that Plaintiff could perform those jobs as they are generally performed in the national economy. (R. 28.) In any event, Plaintiff fails to support his assertion that many chef jobs require 10-to-12-hour workdays with the DOT. (D.E. 6 at 23.) Plaintiff's reliance on "O*NET" is misplaced. ALJs and VEs may rely on the DOT data

even where it conflicts with O*NET, *see Hearn v. Comm'r of Soc. Sec.*, 2019 WL 2710790, at *7,

n.5 (D.N.J. June 27, 2019) ("Though Plaintiff argues [that O*NET] has superseded the DOT, the

Code of Federal Regulations specifically lists the DOT as a source of 'reliable job information[.]"

(internal citations omitted)); *Jean-Pierre v. Comm'r of Soc. Sec.*, No. 16-5691, 2017 WL 4316880,

at *9 (D.N.J. Sept. 28, 2017) ("It is not for this Court to reform the methodology that SSA [VEs]

use to determine available and appropriate jobs in the national economy that match a claimant's

RFC."), and that is what the ALJ did here.

## IV.      CONCLUSION

For the reasons set forth above, the Commissioner's decision is **AFFIRMED**.   An

appropriate order follows.


                                            ___/s/ Susan D. Wigenton_____
                                            **SUSAN D. WIGENTON, U.S.D.J.**


Orig:   Clerk
cc:      Parties